## A11A1916. BANK OF THE OZARKS v. DKK DEVELOPMENT COMPANY.
### (726 SE2d 608)

BARNES, Presiding Judge.

DKK Development Company petitioned the superior court for a declaratory judgment against Oglethorpe Bank Holding Company, Inc. (the "Holding Company") and Oglethorpe Bank, seeking to have DKK's $930,000 debt to the bank set off against DKK's $2 million loan to the Holding Company. After a hearing, the trial court granted the declaratory judgment, finding that DKK was entitled to an equitable

set-off of its debt to the bank. In its order, the court "deemed" DKK's $930,000 note to the bank to be paid in full and ordered that the Holding Company's $2.25 million promissory note to DKK be reduced accordingly. The trial court also directed the Clerk of the Superior Court to cancel and mark as satisfied the bank's deeds to secure DKK's debt, and to attach a copy of the court's order to the original DKK promissory note and deed to secure debt.

Oglethorpe Bank and the holding company appealed. Less than a month later, the Georgia Department of Banking and Finance ("GDBF") closed Oglethorpe Bank, and the Federal Deposit Insurance Corporation ("FDIC") was appointed receiver. The FDIC then transferred assets of Oglethorpe Bank to Bank of the Ozarks, including the loan to DKK, and the trial court substituted Bank of the Ozarks as the defendant successor in interest to Oglethorpe Bank. Bank of the Ozarks then filed an amended notice of appeal, noting the substitution, and the Holding Company, which was already insolvent when the trial court held its hearing in this case, withdrew from the appeal.

Bank of the Ozarks ("the Bank")[1] argues on appeal that the trial court erred in offsetting its loan to DKK against DKK's loan to the Holding Company because the set-off violated federal banking regulations, specifically Federal Reserve Regulation W, 12 CFR Part 223, limiting the transactions between a holding company and its wholly-owned subsidiary bank. See 12 CFR § 223.11. The Bank also argues that the set-off violated the Bank's consent order from the GDBF and the FDIC, DKK had "unclean hands" and was not entitled to equitable relief, and the set-off was not permissible because the Bank was not the same entity as the Holding Company. We agree that the set-off was improper because the Bank and the Holding Company were separate entities, and therefore reverse the trial court. We need not decide whether the set-off was also improper for other reasons.

A trial court's findings of fact after a declaratory judgment hearing "are analogous to a jury verdict and will not be interfered with if there is any evidence to support them. However, we review the trial court's conclusions of law de novo." (Citation and punctuation omitted.) *Burnette v. Caplan*, 287 Ga. App. 142, 143 (650 SE2d 798) (2007).

A set-off "allows the defendant to set off a debt owed him by the plaintiff against the claim of the plaintiff." OCGA § 13-7-1. "Between

---

[1] We will refer to the appellant/defendant throughout the opinion simply as the Bank, recognizing that in the trial court Oglethorpe Bank was the party and in this court it is Bank of the Ozarks.

the parties themselves any mutual demands, existing at the time of the commencement of the suit, may be set off." (Punctuation omitted.) *Nixon v. Nixon*, 194 Ga. 301, 303 (2) (21 SE2d 702) (1942). OCGA §§ 13-7-7 through 13-7-11 provide specific legal grounds for which set-off is available. "The right to set off one legal demand against another, other than in cases covered by our statute, is itself an equitable right." (Punctuation omitted.) *Gormley v. Chance*, 55 Ga. App. 838, 841 (191 SE 701) (1937) (codified in OCGA § 23-2-76). That statute provides that, "[r]egarding a setoff, equity generally follows the law; but, if there is an intervening equity not reached by the law or if the setoff is of an equitable nature, equity shall take jurisdiction to enforce the setoff." OCGA § 23-2-76. Whether the claim for a set-off is legal or equitable in nature, however, it must be between the same parties and in their own right. OCGA § 13-7-4; *Shingler v. Furst*, 176 Ga. 497 (168 SE 557) (1933).

The material facts about these transactions are not in dispute. In 2005, DKK obtained a development loan from the Bank which was secured by real property on St. Simon's Island. The bank renewed the loan several times. The loan was last renewed in February 2010 for $930,000.

In 2007, the Bank reorganized, redeemed its shareholders' stock, and issued shares of the Holding Company to the former shareholders of the Bank. The same individuals served as the officers and directors of both the Holding Company and its wholly owned subsidiary, the Bank. DKK's attorney explained that "the holding company was formed solely for the purpose of acquiring cash either by borrowing it or selling stock and passing it down to the bank as capital for the bank." If the Bank borrowed money, its capital or equity did not increase because the loan was offset by a debt. But money transferred from the Holding Company to the Bank constituted an equity contribution which the Bank was not required to repay.

In March 2009, the Holding Company was solvent, but the Bank needed an infusion of capital to avoid falling below a capital-to-asset ratio that would have triggered regulatory action, which would in turn have made it more difficult for the Bank to raise funds in the future. See 12 CFR §§ 325.4 (b), 325.6 (b). Frank Deloach was the vice chair of the Board of Directors of both the Bank and the Holding Company, and owned half of DKK's stock. He was also "the chief architect of the bank," one of its organizers and its largest shareholder. DKK borrowed $2.5 million from another bank at 6 percent interest, drew out $2.25 million, and on March 31, 2009, lent it to the Holding Company for one year at 8.5 percent interest and a fee of $100,000. The Holding Company in turn made an equity contribution of $2 million to the Bank, retaining $250,000 of DKK's loan in reserve.

After the infusion of $2 million in capital to the bank, the parties anticipated that economic conditions would improve to the point that the Bank would be able to start paying dividends again to the Holding Company, which would enable the Holding Company to repay DKK. Instead, economic conditions worsened, and the Bank's value "declined precipitously" over the next year. The Holding Company's loan from DKK matured in March 2010, but the Holding Company did not repay the loan.

The Bank's capital-to-asset ratio fell below six percent, and in June 2010 the Bank entered into a consent order with the GDBF and FDIC. Among other things, the consent order provided that the Bank could not enter into any "covered transactions" with an affiliate. Pursuant to the regulators' suggestions, the Holding Company transferred its remaining $200,000 to the Bank to keep its reserves above two percent and delay the issuance of a "prompt corrective action letter," which would give the Bank 90 days to raise its capital above four percent or face closure. In July 2010, the FDIC issued a letter to the Holding Company notifying it that its financial condition was unsatisfactory with insufficient capital, cash flow, and liquidity, to which the Holding Company's Board of Directors responded in August 2010 by issuing a resolution that it would not issue dividends to its shareholders without the consent of the GDBF and FDIC. Also in August 2010, DKK's loan from the Bank matured and became due and payable.

In October 2010, DKK sued the Holding Company and the Bank, seeking a declaratory judgment that it was entitled to set off its secured debt to the Bank against the Holding Company's debt to DKK. The Holding Company and the Bank answered and objected to the proposed set-off.

In November 2010, the Bank received a corrective action letter from the FDIC, notifying it that the Bank was "critically undercapitalized" and restricting it from taking certain actions.

As of the hearing on December 9, 2010, the Bank was still operating and was attempting to raise enough capital to "stave off" being placed in receivership, but its counsel acknowledged that the capital market was "very fragile" at that time. DKK's counsel stated that "[t]here [was] no question about the fact in reality" that the Bank was going to fail, be closed, and have its assets sold to someone else by the end of January 2011, including its loan to DKK. The Holding Company was insolvent. DKK represented in its hearing brief that if the bank failed, the Holding Company would declare bankruptcy and discharge its loan to DKK. DKK would thus be liable to repay its loan from the Bank and the loan DKK obtained from another bank for the

$2.25 million it lent to the Holding Company, but unable to recoup anything from its loan to the Holding Company.

DKK argued that because the Bank and the Holding Company operated as a single entity, abused their corporate forms, and were alter egos of each other, DKK was entitled to set off its debt to the Bank against the Holding Company's debt to DKK. It also argued that it was entitled to the set-off because the Holding Company had acted as the Bank's agent in accepting DKK's loan.

The Bank responded that DKK understood when it made the loan to the Holding Company that the money would be transferred to the Bank, and that the Bank would not be liable to DKK for repayment, a fact Deloach affirmed in his deposition testimony. The Bank argued that if the trial court set off DKK's loan from the Bank against its loan to the Holding Company, "then the bank suddenly needs to raise a lot more money in order to survive because [the set-off] will have affected the balance sheet drastically." The Bank would "suddenly be worth nine hundred and thirty thousand dollars less . . . and it would have to get that much more in new funding to survive."

During the hearing, the trial court made it clear that, while it did not want to accelerate the Bank's decline, it also did not want Deloach and DKK to have to repay the creditor from which it obtained the $2.25 million it lent to the Holding Company and also have to repay its secured loan to the Bank, while losing any hope of recovering money from the Holding Company. It asked the parties to attempt to "craft something to help keep the bank afloat and also be fair to DKK about this matter," noting that if the FDIC took over the Bank, "then Mr. Deloach [was] going to be worse off than anybody out there." The parties conferred, but when court reconvened they had not reached a settlement, so the trial court continued with the hearing.

At the end of the hearing, the trial court announced that after reviewing the documentary evidence, reading the depositions in the record, and hearing the argument, stipulations, and testimony, it was "not convinced" that anything the court did would jeopardize the bank or affect its imminent decline and granted DKK the relief it requested. Two weeks later, on December 20, 2010, the trial court issued its order granting DKK an equitable set-off of its loan from the Bank against DKK's loan to the Holding Company.

"[M]utuality of obligation . . . is required for a valid set-off." *Brunson v. Bridges*, 130 Ga. App. 102, 103 (1) (202 SE2d 553) (1973). "[A] debt due [from] a partnership cannot be set off against a debt due by a third person to one of the firm. The firm and its individual members are different contractors; each is, in the eye of the law, a separate person. The rule is not different in equity." *Metcalf v. Peoples Grocery Co.*, 24 Ga. App. 663 (a) (101 SE 768) (1920). See *Wayne*

*County Bd. of Commrs. v. Reddish*, 220 Ga. 262, 264 (138 SE2d 375) (1964). Conversely, in *Gormley*, 55 Ga. App. 838, we held that a man was entitled to set off his portion of a sum deposited into a subsequently insolvent bank against his debt to the bank, although we reversed the granted set-off because the city court which heard the case had no jurisdiction to grant affirmative equitable relief. Id. at 841-842.

While this court is not unsympathetic to the personal losses resulting from the demise of Oglethorpe Bank and the Holding Company, DKK knew the risks involved when it made the Holding Company loan and cannot now obtain relief unavailable to any other entities who lent money to the Holding Company simply because it borrowed money from the Bank years ago.

For these reasons, we conclude that the trial court erred in granting DKK's request for a declaratory judgment, directing the Bank to deem DKK's note to the Bank paid in full, and ordering the superior court clerk to cancel, release, and mark satisfied the deeds securing DKK's debt to the Bank.

*Judgment reversed. Adams and Blackwell, JJ., concur.*

DECIDED MARCH 23, 2012 —
RECONSIDERATION DENIED APRIL 12, 2012 — ▆▆▆▆▆▆▆▆

*Taylor, English & Duma, William G. Leonard, James A. Bishop,* for appellant.

*Gilbert, Harrell, Sumerford & Martin, Wallace E. Harrell, James L. Roberts IV,* for appellee.